CASE 20—ACTION TO RECOVER MONEY PAID—DEC. 4.

# Allison, &c. v. Cocke's Exrs.
# Same v. Preston's Exrs.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION

JUDGMENT FOR DEFENDANTS AND PLAINTIFFS APPEAL. REVERSED.

TRANSFER TO ORDINARY DOCKET—ISSUE OUT OF CHANCERY—VENDOR AND PURCHASER—MEASURE OF DAMAGES FOR BREACH OF CONTRACT—EVIDENCE AS TO VALUE.

Held: 1. In an action by purchasers against the vendors for relief against a forfeiture provided in the contract, it having been determined on appeal that plaintiffs were entitled to recover the money forfeited after deducting the damages which defendants had suffered by the breach of contract, the trial court should, on the return of the case, have sustained defendants' motion to transfer the case to the ordinary docket, as the only issue left to be determined was as to the amount of damages; but, as plaintiffs objected to the motion, they can not complain that it was overruled.

2. Though plaintiffs objected to an issue out of chancery, and excepted to the manner of its submission, yet if it was right to grant such an issue, and the issue was properly tried and determined, plaintiffs were entitled to the benefit of such determination, unless there had been previous prejudicial error against defendants.

3. Defendants were entitled to have a jury pass upon the issue of damages, and not merely to find the value of the property at the date of the breach; and as the chancellor, in submitting the issue out of chancery, submitted only the question of value, he properly set aside the verdict.

4. Where vendors sought to recover damages for the purchasers' breach of contract, it was competent to show, as affecting the value of the property at the time of the breach, that there was at that time an unusual demand for property such as that purchased, for the purpose of development for suburban homes, however unreal the cause of the demand, and that many companies were formed about that time for the purpose of purchasing, developing and exploiting such property; and it was also competent to show that the demand continued to exist for a reasonable length of time after that date; but it was not competent to show as original testimony that by the expenditure of large sums of money in improvements large amounts might be realized from a speculation, though such testimony might be admissible on cross-examination as showing the reason for the existence of the demand.

5. When purchasers come into equity for relief against a forfeiture, they must make the vendors entirely whole before they are entitled to a return of the forfeit money; and therefore the vendors are entitled not only to the difference between the value fixed by the contract and the fair market value at the date the contract was broken, but also to their reasonable costs and expenses, including commissions actually paid to real estate agents for effecting the sale; but they are not entitled, in any event, to damages beyond the penalty named in the contract.

HELM, BRUCE & HELM for appellants.

This is the second time these causes have been in this court. (Allison, &c. v. Cocke's Exr., &c., 21 Ky. Law Rep., 434.)  On each appeal, Allison and Fawcett, who were the plaintiffs below, have been the appellants.  On the original trial in the circuit court, before the first appeal, the court entered a judgment dismissing absolutely the petition of plaintiffs.  On appeal this judgment was reversed, and the cause remanded for further proceedings.  On the return of the case to the circuit court, that court, at the instance of defendants, directed an issue out of chancery on a question of fact, to be tried by a jury.  The jury returned a verdict which, if the court had accepted it, would have resulted in judgments in favor of plaintiffs against the two sets of defendants for $20,500, exclusive of interest. But the court disregarded and discarded this verdict of the jury, and on final submission entered judgment in favor of the defendants against the plaintiffs for sums aggregating $35,100.

To state the case more particularly, the heirs and devisees of Mrs. Elizabeth Cocke, and the heirs and devisees of Col. J. T. L. Preston (Mrs. Cocke and Col. Preston being brother and sister)

owned two adjoining tracts of land, one of about 600 acres, and the other about 300 acres, making in the aggregate about 900 acres, beautifully situated just south of the city of Louisville, about 1½ miles from the city limits. In February, 1891, when there was a great fancy in and around the city for suburban properties, and when the values of such properties were high in every direction, the plaintiffs, Allison and Fawcett, made contracts with the Cocke heirs and the Preston heirs, for the purchase of these two adjoining tracts. Under these contracts, the property was not sold by the acre, but in gross. The price named for the Cocke property was $250,000 (that tract containing 572 acres), of which the plaintiffs agreed to pay five per cent. ($12,500) on or before March 1st, and $50,000 on or before May 1st, and then pay the remainder on or before one, two and three years from date, and if the cash payment of $50,000 should not be made on May 1st, the Cockes should have the right to forfeit the $12,500 paid on March 1st (21 Ky. Law Rep., 435).

The Preston contract was the same in general form as the Cocke contract, the price named being $160,000, for the 320 acres, five per cent. ($8,000) to be paid March 1st, and $32,000 on May 1st, with the balance in one, two and three years from date; and also provided for the forfeiture of the $8,000 cash payment if the $32,000 should not be paid on May 1st, which latter provision was subsequently extended until August 11th in the Preston contract.

The plaintiffs paid the two sums required to be paid at the beginning—$12,500 to the Cockes and $8,000 to the Prestons, making in all $20,500 paid in hard cash on these contracts. When May 1st came, plaintiffs found themselves unable to raise the $50,000 and $32,000 then due. Thereupon the Cockes immediately announced a forfeiture of the $12,500 which had been paid to them. The Prestons were not in a position to do this on May 1st, because a deed which they had prepared and expected to tender had gotten lost in the mails, and they could not make their tender on May 1st. No formal tender of this deed was made until August 11th, when they made a tender of the deed and demanded the immediate performance of the contract by the payment of the $32,000 in cash. The plaintiffs were not able to pay the money, and thereupon the Prestons announced a forfeiture of the $8,000, which had previously been paid them.

Believing that the alleged contracts for the purchase and sale were, in fact, void, because, on behalf of the Cockes and Prestons, they had been made by executors who had never qualified

in the State of Kentucky, and believing, moreover, that if the contracts were void, yet the provisions for the forfeiture of these large sums of money were not enforceable, the plaintiffs brought these two suits to recover the moneys which they had paid under the circumstances heretofore explained.

On the trial the circuit court held that the contracts were valid, and without deciding the question of the legality of the forfeitures, dismissed both petitions.

On appeal, this court held the contracts to be valid by reason of the qualification of the executors subsequent to the execution of the contracts, but the court further held that the forfeitures were not valid or enforceable, and that plaintiffs were entitled to recover from the Cockes $12,500, and from the Prestons $8,000, less whatever damage the defendants could show they had sustained by reason of the breach of the contracts.

Upon the return of the case to the circuit court, the defendants practically became plaintiffs, so far as the undetermined issue was concerned. The defendants then filed amended answers and counter-claims, alleging that they had sold these properties to the plaintiffs for sums vastly in excess of their fair value; the Cockes alleging an excess of $50,000, and the Prestons an excess of $60,000, and for these two sums they prayed judgment, and, in addition thereto, for large sums they claimed to have paid for commissions on the sales and expenses of coming to Kentucky to qualify, so as to carry out the contracts.

Issues were joined on these amended pleadings, and the only real question to try was the value of these lands in May and August, 1891, the defendants claiming they were damaged by the breach the difference between the contract prices and the real values of the lands at the date of the breach.

A jury trial was had, the two cases were heard together, and after a trial lasting two days, and hearing many witnesses and full argument of counsel, they returned a verdict fixing the value of the Cocke land, on May 1, 1891, at $250,000, and that of the Preston land on August 11, 1891, at $160,000, thus finding that the sums named in the contracts were, in fact, the fair market values of the lands at the dates fixed for the payment of the contract prices.

On submission of the case to the court, upon this finding, the judge decided to disregard the verdict of the jury and fix the value himself, which he did, fixing the value of Cocke land at $375 per acre, making $214,500, and the Preston land at $400 per acre, making $128,000. The court by its judgment then ascertained the difference between the contract prices for

these lands and the values which the court fixed, thus ascertaining the amount of the defendant's damages, against which it credited the amount of the moneys which plaintiffs had paid to the defendants and which defendant had forfeited, allowing interest on these last named sums and took the balance as the judgments to which defendants were entitled; thus giving the Cockes judgment for $15,666 and to the Prestons $19,440, the two judgments aggregating $35,100.

We know that the verdict of a jury on an issue out of chancery is not as binding on the court, as the verdict of a common law jury, yet the very reason why the court ever directs an issue out of chancery is because the question is supposed to be one which a jury is better adapted to determine than the chancellor. This jury was composed of substantial business men and we submit that their verdict ought to be allowed to stand and to control the chancellor's judgment; and on the whole case we submit that the defendants have not established their counterclaim by showing that the fair market values of these lands in 1891 were less than the prices fixed in their contracts; that they have not established their claim for damages, but that plaintiffs should have judgment against them for the money which they attempted to forfeit, with interest from the day of payment, to be credited by not exceeding $250 expenses allowed the defendants.

### AUTHORITIES CITED OR EXPLAINED.

#### MEASURE OF DAMAGES.

Boom Company v. Patterson, 98 U. S., 403; Ottoway v. Nashville, 88 Tenn., 510 (13 S. W., 123); Five Tracts of Land v. U. S., 101, Fed. Rep., 661.

#### EXPENSES.

Mackey v. Ohlsen, 12 Oregon, 429 (8 Pac., 357.)

#### INTEREST.

Henderson Cotton Co. v. Lowell Machine Shop, 86 Ky., 675.

R. H. BLAIN AND T. W. & W. M. BULLITT, FOR APPELLEES.

(No brief in record.)

OPINION OF THE COURT BY JUDGE DURELLE—REVERSING.

On February 12, 1891, by a written contract between appellants and the appellees, the executors of Eliza R. Cocke, it was recited that appellants "hereby agree to purchase from said Cocke's executors the following real estate, lo-

cated in the county of Jefferson, Kentucky, towit, a tract of land containing 609 acres more or less, .. . for the sum of $250,000, to be paid as follows: One-fourth cash, and the balance on or before one, two, and three years, with interest at six per cent. per annum from date till paid; said deferred payments to be secured by deed of trust on said land. The said Allison & Fawcett hereby agree to pay five per cent. of said cash payment—said five per cent amounting to the sum of $12,500—on or before the first day of March, 1891; and they agree further to pay the residue of said cash payment, with six per cent. interest thereon from date till paid, on or before the first day of May, 1891. The said Allison & Fawcett hereby also agree that in the event they do not pay the residue of said cash payment by May 1, 1891, then said sum of $12,500 paid by them on or before the first day of March, 1891, shall be wholly forfeited to said Cocke's executors, without recourse on the part of said Allison & Fawcett. And said Cocke's executors hereby agree that, in the event that the residue of said cash payment is paid on or before May 1, 1891, and the notes for the deferred payments and said deed of trust are executed and delivered to them, then they will convey said tract of land to said Allison & Fawcett, or their assigns, by good and sufficient deed of conveyance, with general warranty. It is further agreed by said parties of the first and second parts that, in the event that the residue of said cash payment is not paid on or before May 1, 1891, then this contract to be null and void, and of no effect, except as to the payment of said $12,500 to said Cocke's executors by said Allison & Fawcett." By an addition to the writing, referring to its terms, an exactly similar contract was made between Allison & Fawcett and the appellees, Preston's executors as to a tract of land

adjoining the Cocke land, containing 320 acres, more or less, the price of which was stipulated to be $160,000, payable in exactly the same manner as the purchase price of the Cocke land. $12,500 was paid to Cocke's executors and $8,000 to Preston's executors, but appellants were unable to pay the residue of the cash payments. On May 1, 1891, Cocke's executors tendered a deed, and demanded payment of the residue of the cash payment, which being refused they declared the transaction closed, declared a forfeiture of the $12,500 which had been paid, and gave an option upon their land to other persons. The Prestons made a tender of their deed upon August 11, 1891, and in like manner declared a forfeiture of the $8,000 which had been paid to them. Suits were brought by appellants to recover the sums paid, on the ground that a good title could not be made under the Cocke contract; that the Preston land was agreed to be purchased as forming one tract with the Cocke land, the whole agreement as to both tracts forming one contract; and that the retention by the Cockes and Prestons of $20,500 was a plain and simple forfeiture, for which nothing was given. On the other hand, it was claimed that the agreements were mere options to purchase, for the giving of which the two sums aggregating $20,500 formed the consideration. A number of other questions were raised, none of which are necessary to the consideration of the present appeal.

On the former appeal this court held, Allison v. Cocke's Ex'rs, 106 Ky., 763 (21 Ky. Law Rep., 441) (51 S. W., 593), that the contracts were contracts for the sale of land, and not contracts by which, for a money consideration, options were granted at a fixed price. It was held, also, that both the provisions for a forfeiture and the provision that the contracts should be void for nonpayment of the remainder of the

cash payment agreed on were not inserted for the benefit
of appellants, but for that of appellees; that, under the
latter provision, appellees had the right either to sue for
an enforcement of the contract or to declare it annulled
for nonperformance; that, having availed themselves of
their privilege, and declared the contract at an end, the
payment made was a penalty, and could not be construed to
be an amount fixed as liquidated damages; that, therefore,
equity should relieve against the penalties sought to be
enforced, and compel the restitution of the purchase money
paid, less the actual damage to the vendors occasioned by
the breach, but that the amount was not limited to the ex-
penses incurred by appellees in coming from Virginia to
qualify in this State, and that they were entitled to de-
duct whatever amount they could show they had been dam-
aged by the breach of what was conceded to have been
an advantageous contract. On the return of the cases,
the appellees (defendants) filed amended answers and
counterclaims, and moved to transfer the cause to the com-
mon-law docket. Appellants objected, and the motion was
overruled. Appellees then moved the court to direct an
issue out of chancery for the trial by jury of the issue of
damages tendered by the amended answers and counter-
claims. This motion was sustained over the objection of
the plaintiffs. As the causes were heard together, upon
the same evidence and similar pleadings, we shall consid-
er them as one case, except where it may be necessary to
treat them separately. The amended answer and counter-
claim avers that appellees were put to great trouble and
expense by reason of the failure of appellants to comply
with the contract; that the amount agreed to be paid for
the land, towit; $250,000 for the Cocke land and $160,000
for the Preston land, exceeded the actual value of the land

at the date of the breach by more than $50.000 in the one case and by more than $60.000 in the other case. Various sums were also claimed as incurred by reason of the contracts, viz., expenses of traveling to and fro between Virginia and Kentucky in executing and endeavoring to enforce the contracts, and in amounts incurred and paid to real estate agents for effecting the sale. A trial was had on certain issues of fact submitted to the jury by the court. What was the fair market value of the Cocke land on May 1, 1891, and of the Preston land on August 11, 1891— the dates named being the ones upon which the respective contracts were declared by the vendors to be at an end? The jury found that the fair market value of the Cocke land on the date indicated was $250,000, and the fair market value of the Preston land on the date indicated was $160.000; those sums being exactly the sums stipulated for as the purchase price of the two properties in the contracts of sale. Appellees moved for a new trial on the issue out of chancery on the ground that the verdict was not sustained by sufficient evidence, was against the weight of the evidence, and contrary to law; on the ground of error of law occurring at the trial in the admission and rejection of evidence, and in the refusal of the court to submit to the jury the question of damages sustained by appellees in procuring and carrying out the contract sued on; and on the further ground of misconduct of counsel for the prevailing party in arguing to the jury that the contract sued on had been adjudged by this court to be a sale. A transcript of the record on the trial of the issues out of chancery was filed, and orders made, the ultimate effect of which was to give leave to take further proof on the question of the amount of expense incurred and paid appellees in complying, or tendering compli-

ance, with the contracts sued on.   Additional grounds for
a new trial were filed by appellees, more specifically set-
ting forth appellees' grounds of complaint, and also sep-
arate exceptions to evidence taken on the hearing.   The
learned chancellor below, in his opinion and judgment,
took the ground that the verdict of the jury upon the issue
out of chancery, while entitled to the greatest respect, was
not conclusive upon the chancellor on the final submission
of the case; that the intervention of the jury was merely
auxiliary to the court, and served only as an aid to the
court in rendering its final decree.   He held, moreover,
that, if this had been an action at law by the appellees
against Allison & Fawcett to recover damages for the
breach of the contract, he would have no hesitation in
granting a new trial, because the jury, in making up their
verdict, were influenced by statements of witnesses which
should not have been admitted by the court or considered
by the jury.   He thereupon proceeded to consider the evi-
dence in the record which he deemed material, rejecting
a large part of the testimony which had been admitted to
the jury; set aside the verdict of the jury on the ground
that incompetent testimony had been admitted in evi-
dence, and that the verdict was not sustained by, and was
contrary to, the weight of the competent evidence; and
rendered judgment in favor of Cocke's executors for $35,-
500, subject to a credit of $12,500, paid under the contract,
with interest from the date of its payment, and a judgment
in favor of Preston's executors for $32.000, subject to a
credit of $8,000, the amount paid under the contract, with
interest from the date of its payment.   The questions pre-
sented on both sides, and most elaborately argued, seem
to cover all possible aspects of the case.   We shall not
attempt to set them out in detail in this opinion, but shall

content ourselves with a general statement of what we consider the controlling principles.

When the opinion and mandate of this court were filed, if no new issue had been presented, the duty of the chancellor was plain and simple. There was but one thing to be done. That was, to decree relief against the forfeiture provided in the contract, and give judgment for the sums forfeited, in accordance with the mandate. The litigation over that question was at an end. It was established that the vendees were entitled to recover the sums paid by them, but that the vendors might, if they desired, show what damages they have suffered by the breach, and deduct the amount thereof from the amount the vendees were entitled to recover. The vendors, by their answers and counterclaims, set up the damages they claimed. For all practical purposes, the cases then stood in the position of actions for damages. There can be no question that the consideration of an issue as to the amount of damages suffered is one peculiarly within the province of a jury. That was the only issue in the case, the question of relief against the forfeiture having been definitely determined. So, when the vendors moved to transfer the cases to the ordinary side of the docket, their motion should have been sustained. The cases should have been so transferred, and the amount of damages should have been ascertained by a jury, under proper instructions. But, as the vendees objected to the transfer, they can not be heard to complain that the motion was overruled, for they are in the position of consenting that the issue should be tried by the court in equity. The vendors then moved for an issue out of chancery upon the question of damages. This also was objected to by the vendees. The court did not grant the motion as made, but granted an issue out of chancery

to ascertain the market value of the two tracts at the time the contracts were broken. This left it to the court to ascertain by computation the damage, if any, occasioned by the depreciation between the dates of the contracts and the dates of the breaches. The vendees not only objected to the motion to direct an issue out of chancery for the trial of the issue of damages tendered by the answers and counterclaims, but excepted to the order granting that issue with a modification. Although the vendees objected to the issue out of chancery, and excepted to the manner of its submission, nevertheless, if it was right to grant such an issue, and the issue was properly tried and determined by the jury, the vendees were entitled to the benefit of such determination, unless there had been previous prejudicial error against the vendors. We need not discuss at this point the various questions upon the admission and rejection of testimony urged by the vendors as justification for the setting aside of the verdict of the jury, for we have reached the conclusion that, under all the circumstances of these cases, the verdict should have been set aside. The vendors were entitled to have a jury pass upon the issue of damages—ascertain the extent to which they had been injured by breaking the contracts—and not merely answer a question of value of the property at the date of the breach. For this and other reasons, not necessary to be here set out, we are of opinion that the action of the chancellor in setting aside and disregarding the verdict was proper.

When the verdict was properly set aside, the chancellor, so far as the vendees were concerned, had the right to proceed to determine the issue presented by the counterclaims. If he determined the issue upon correct legal principles and upon the competent testimony, the vendors might com-

plain, because they demanded their right to have that question determined by a jury; but the vendees could not be heard to do so. In his opinion the learned chancellor below rejected practically all the testimony introduced by the vendees to show the existence of an unusual real estate market, in 1891, in and about the city of Louisville, produced by a widespread desire to purchase suburban properties for purposes of development or speculation. Said the court, referring to a number of witnesses who had testified to the existence of such market and such demand: "The testimony of the foregoing witnesses, it will be seen by a critical examination thereof, places an unreal, fictitious, speculative value upon the land, and does not determine what was its fair, reasonable market value; and yet the jury was permitted to hear that testimony, and to base their verdict upon it. . . . 'The vice in the verdict, therefore, involves no blame upon the jury as having given a verdict contrary to the evidence, but a verdict essentially based upon evidence which should not have been considered by them." And in the judgment it was said that "the verdict was not sustained by, and was contrary to, the weight of the competent evidence." It follows, therefore, that, if this evidence was all incompetent, the court did right in rejecting it; but, if it was competent, the court erred, and we should state wherein it was competent, and the extent to which and the proposes for which it should have been admitted. The evidence shows that the Cocke and Preston heirs owned two adjoining tracts of land, aggregating nearly 900 acres, about a mile and a half south of the city limits of Louisville, extending from Preston street pike to the Poplar Level pike, and crossed from east to west by the Louisville Southern Railroad. This was the land about which this litigation arose. There

is evidence which shows that at the time the contracts were made, and for some time thereafter, there existed in Louisville what is termed a "boom" in suburban lands. If the testimony is true, a demand was created for land like this. If such a demand existed, this property was properly situated, and was of proper amount, to meet it; for it is obvious that such a demand could not be met by small and disconnected tracts. The demand was not the purpose of establishing gardens or truck farms. It was for the purpose of development. It contemplated the utilization of large bodies of land, the expenditure of large sums of money in such ways as would render such lands, when subdivided, attractive to prospective purchasers of suburban homes. It contemplated that the cheap and easy means of access to the lands should be provided, or at least projected. Now, it does not matter how unreal, fictitious, fantastic, or visionary was the basis of this demand, how wild the dreams of speculative profits from which it sprung, if such projects of improvement existed, and if they created a real demand, that demand necessarily affected the market value of the property which answered its requisites. From the testimony in this case it would seem that the existence of this demand, extraordinary and unusual, was the reason why the vendors were able to make the contracts in question, and why some, at least, of the vendors hesitated to enter into those contracts. Under ordinary circumstances, and at ordinary times, the value of this property was what it would bring in the market for garden, farm, and grazing purposes in lots to suit purchasers. In 1891, when these contracts were made and broken, the property was neither held nor offered to purchasers for such purposes. Its value in the

market was its value for the most valuable purpose for which it was available. And so, during the existence of the boom, nobody considered it, situated as it was, and available as it was for suburban purposes, for the purposes of gardening, farming, or grazing. If this demand existed in the same measure at the date of the breach of the contracts as at the date of their execution, it was competent for the vendees to show its existence; if not to the same extent, then it was competent to show the extent to which it did exist. It was also competent to show that it continued to exist, after the date of the breach, for a reasonable length of time, because such testimony tended to show that, however unreal the cause of the demand, the demand itself was real and continuous. In this connection it was proper to show that many companies were formed at or about the date of the breach for the purpose of purchasing, developing, and exploiting suburban property. The market value of property is gauged by the desires of the public; and the desires of the public are real, however foolish or fanciful may be their cause. It is incompetent, on the other hand, in such a case to show as original testimony that, by the expenditure of large sums of money in improvement, in laying off streets, in building electric lines, etc., large amounts of money might be realized from a speculation; for such testimony is as to purely speculative profits. And while such testimony might be properly admissible upon cross-examination, as showing the reason for the existence of the demand, it is not admissible as original testimony to show that there is a demand.

We think we have sufficiently indicated the general lines which we think proper as to the admissibility of testimony in such cases, and that they are abundantly sustained by authority. In the case of Boom Co. v. Patter-

son, 98 U. S., 403 (25 L. Ed., 206), the appellant, a company authorized to construct booms on the Mississippi river, sought to condemn three islands lying close together, parallel to, and about an eighth of a mile from, the west bank of the river. The islands were extremely available for the purpose of forming a boom for catching and holding logs. The jury found a general verdict assessing the value of the islands at $9,358.33, but accompanied it by a special verdict fixing the value, aside from any consideration of its value for boom purposes, at $300. The court required the owner to reduce the verdict to $5,500. The supreme court, in an opinion by Mr. Justice Field, said: "Upon the question litigated in the court below, the compensation which the owner of the land condemned was entitled to receive, and the principle upon which the compensation should be estimated, there is less difficulty. In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such case must be, what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted; that is to say, what is it worth from its availability for valuable uses? Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it, and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated. . . . The position of the three islands in the Mississippi fitting them to form, in connection with the west bank of the river, a boom of immense dimensions, capable of holding in safety

over twenty millions of feet of logs, added largely to the value of the lands. The boom company would greatly prefer them to more valuable agricultural lands, or to lands situated elsewhere on the river; as, by utilizing them in the manner proposed, they would save heavy expenditures of money in constructing a boom of equal capacity. Their adaptability for boom purposes was a circumstance, therefore, which the owner had a right to insist upon as an element in estimating the value of his lands." To the same effect, see the Furman St. Case, 17 Wend., 669; Goodin v. Canal Co., 18 Ohio St. 169, 98 Am. Dec., 95; Young v. Harrison, 17 Ga., 30. There is a line of cases in which a different rule has been applied—not applicable here—where there was only one possible purchaser for a particular purpose; as in the case of Five Tracts of Land of Cumberland Tp. v. U. S., 41 C. C. A., 580, 10 Fed., 661, in which the government desired to condemn the battlefield of Gettysburg for a park. Said the court in that case: "The question still is as to the market value, and not its peculiar value to the single peculiar purchaser— the government of the United States. In other words, I repeat, the market value is to be ascertained; and, no matter what may be the thing which enhances or diminishes the market value, the jury are entitled to have it, and consider it, but they are not entitled to consider this property as being of increased value because the United States is the purchaser for a purpose." See, also, Alloway v. City of Nashville, 88 Tenn., 510, 13 S. W., 123, 8 L. R. A., 123.

We come now to the consideration of the measure of damages. The vendors were entitled, first, to the difference, if any, between the value fixed by the contract and the fair market value, ascertained on the lines we have

indicated, at the date the contract was broken. They were further entitled to their reasonable costs and expenses, including commissions, if any, actually paid to real estate agents for effecting the sale of the land, which were necessarily expended in the effort to complete the sale. It will not do to say that, as they still have the land, if they are awarded the difference between the market value at the date of the breach of the contract and the contract price they are in *statu quo* as before the contract was made. They are entitled to be placed in *statu quo* as if the contract had been carried out, in which case they would not be required to expend any more money in effecting a sale. In other words, they are entitled to the difference between what they would have realized from a sale made at the date of the breach and what they would have realized from the contract if it had been carried out. This is not the ordinary case of a suit for damages. The vendees have come into equity for relief against a forfeiture. That relief is granted them on terms. They must make the vendors entirely whole before they are entitled to the return of the forfeit money. They can not ask that the vendors return to them money which has been paid out for expenses. But they are not entitled to damages, in any event, above the amount fixed in the contracts. If the vendees had rested content after the declaration of forfeiture, it is not to be supposed that the vendors would have been permitted to recover a large amount beyond that forfeiture. The penalty named in the contracts fixes the limit of recovery. Upon the return of the cases they should be transferred to the ordinary side of the docket, and proceed at law for the ascertainment of the damages.

The judgments are reversed, and causes remanded, with directions for further proceedings consistent herewith.

Whole court sitting.

Chief Justice Paynter and Judges Guffy and O'Rear, dissenting.

Response by Judge Hobson to a petition for rehearing and modification of the opinion.

Appellants' counsel, by petition for rehearing, has presented with great force the proposition that appellees, having an election of remedies for the breach of their contract, can not take more than one; or, as he puts it, "declare the contract void, and at the same time seek a recovery which could only be based on the contract." His argument is based upon the theory that the vendors have declared ·the contract void, and have sought to hold the forfeited money; that this must be done subject to the vendees' right to sue in equity for relief against the penalty and that the vendors have the right to ask the court to require the vendees, who come into court seeking equity, to do equity. Of course, when counsel speaks of declaring the contract void, and at an end, he refers only to that part of the contract which requires the vendors to convey their land and the vendees to pay for·it, for the contract does not provide that it shall be entirely void by reason of the breach, but expressly excepts the payment of the two sums aggregating $20,500. So the declaration of forfeiture and the attempt to retain the forfeited money is an attempt to enforce the literal terms of the contract. The vendor's claim is upon the contract, and the vendees have sued for equitable relief against enforcement of this provision of the contract. The relief is granted them upon equitable terms, which are that the vendors shall not be

put to actual loss because a court of equity relieves against the enforcement of their contract right. By the terms of their contract they were entitled to $20,500, already paid to them as an indemnity against loss by reason of the breach of the contract. Having elected to rely upon this indem-nity, they are limited to the amount of it. They can not get more than the amount thus fixed, but they must not be compelled in equity to take less than the loss they have suffered by the vendees' failure to carry out the con-tract. They are allowed to retain out of their forfeiture so much, and only so much, as will make them whole; sub-stantially the same amount that they would obtain by a suit for specific performance, for in such a suit the costs of decretal sale would go against the vendees in the con-tract.

Appellants' case is an application by them to be relieved from a forfeiture. It rests upon the ground that appellee should not, in justice and right, be permitted to retain appellants' money for nothing. The relief which equity will afford them must be governed by equitable princi-ples. In so far as appellees have paid out the money re-ceived from appellants in reasonable expenses fairly in-curred in making or attempting to carry out the contract, they should not be liable; for this money is not in their hands,- and the principles on which appellants' action is grounded apply only to money in the hands of appellees which, in equity, they should not be permitted to retain. And in determining how much, if any, of the sum paid by appellants to appellees may be retained, equity will not consider alone the disbursements made by appellees, but-will take into consideration also the rights of appellees, and the situation in which they are left. If, at the termin-ation of the contract, the property, valued at its reasonable

market price, was not of value equal to the amount coming
to appellees from appellants under the contract, then to
this extent they would be losers by reason of appellants'
breach of the contract, if the fund in their hands is taken
from them. Equity will not aid appellants in making a
profit out of their own breach of contract, at the expense
of appellees. Appellants can not be placed in a more
favorable situation than they would have occupied if they
had complied with their contract, and they can recover
only so far as, in justice and right, appellees should not be
allowed to retain the money paid to them over and above
their cost and reasonable expenses. If the property was
of value equal to the balance due under the contract, they
may recover the whole balance. If it was not, they may
recover only so much of it, if any, as remains after deduct-
ing the loss which appellees sustained by appellants' fail-
ure to carry out their contract.

The petition is overruled.