No. 3.—EDWARD B. YOUNG, assignee, &c. plaintiff in error, *vs.* JAMES HARRISON and another, administrators, &c. defendants in error.

[1.] Where the owner of a parcel of ground had been deprived thereof, by an incorporated company, for the purpose of appropriating the same as a bridge site, and by virtue of a provision in their charter, an appeal had been taken from commissioners or appraisers to a Jury, and the latter were called upon to award just compensation to the land owner: *Held*, that the value and damage, at the time the land was taken, was the thing to be ascertained; but that to discover this, the Jury were authorized to look to the prospective value of the property as a bridge site, and to take that into consideration also, in determining what it was then worth.

[2.] Where a portion of a land holder's real estate is thus taken from him, for public purposes, without his consent, commissioners, or a Jury in their stead, may take into consideration prospective and consequential damages, which result therefrom, if the same are plain and appreciable.

[3.] Upon similar principles, when endeavoring to ascertain just compensation, the Jury should carry to the other side of the account the benefits (or increase in the value of the land) to the land holder; for they cannot *justly* award him compensation for an injury, if he has not been injured, but benefitted.

[4.] If an instrument of writing be submitted to the Jury by one party, who afterwards proposes to withdraw the same, to which objection is made by the opposite party, who insists on its remaining with the Jury as evidence, an exception by him, after verdict, that the same was improperly admitted as evidence, will not be sustained.

Young, assignee, &c. *vs.* Harrison and another, adm'rs, &c.

[5.] Where an Act, incorporating a bridge company, provides that the company shall have power to select and take such parcel or parcels of land as they may deem necessary for the construction of the bridge, from any land owner, and requires that a plat of the land so taken shall be made, and with the award of the appraisers who shall assess the value of the land so taken, (or the verdict of the Jury,) shall be recorded in the Clerk's office of the Superior Court where the land lies, and shall vest the right of fee simple to the land in the company: *Held*, that upon trial of a case made by appeal from appraisers to the Superior Court, the said plat should have been submitted to the Jury; and it was error in the Court to reject the same as evidence for their consideration.

Proceeding to assess damages in Randolph Superior Court. Tried before Judge PERKINS, April Term, 1854.

Under the charter of the Irwinton Bridge Company, they were authorized to appropriate the land necessary for an abutment on this side the river, and a proceeding was authorized to ascertain the value thereof, in the event of a disagreement with the owners. Such disagreement having arisen, the appraisers assessed the damages at *Ten Dollars*. The defendants in error (Harrisons) appealed to the Superior Court, and on the trial of this appeal, the errors assigned are alleged to have occurred.

The Court decided the assessment by the appraisers at $10, was admissible as pleading, but not as evidence of the true value. This is the first error assigned.

Sundry exceptions were made to evidence admitted and rejected. They are all included in the questions made upon the charge of the Court.

The Court charged, that the only issue was the value of the land; that the Jury were acting as appraisers, and should be governed by the evidence; that in ascertaining the damages, the purposes for which the land is valuable, are to be taken into consideration. If it was taken as a bridge site, it must be paid for as such; and all tne surrounding circumstances are to be taken into the account, and the estimate of value or damages was to be made *now*, as of the present time, when the title is to be divested.

Suppose, said the Court, no bridge had been built, the Jury would have to inquire what would be the probable amount of travel, tolls, commerce, and the probable value of ware-houses, wharfs, towns, villages, &c. to grow up on the other side of the river, with and without a bridge, in order to ascertain damages or value as a bridge site. The bridge being built, the Jury were not left to suppositions—but evidence of these things had been admitted to show the eligibility of the site and its value; and for this purpose, were proper for their consideration; that the Jury were to take into consideration not only its value to the Harrisons, who did not own the franchise, but its value to the company, who did own the franchise; that its value to the company was indeed the proper question for the Jury; that in addition to this, the Harrisons were entitled to recover whatever damage was done to their other property—to their private interest—to their other lands and interests—than that portion occupied as a bridge site. Whatever damages or injury they sustained, in any way, independent of the damages or value of the bridge site, are to be taken into the account. If their other lands were valuable for ware-houses, wharfs and towns, or for any other purpose above and below the bridge, and this value decreased in consequence of the occupation of the bridge site, they were entitled to just compensation therefor.

To all and every part of which charge Young excepted.

Counsel for Young then asked the Court, in writing, specifically to charge the Jury—

1st. That the Harrisons are entitled to recover the damages or value of the land as a bridge site, to be estimated by its condition or value, when the Act of incorporation was passed, or prior to the building of the bridge; which specific charge the Court refused to give, and charged in lieu thereof, that the damages or value was to be estimated as of the *present time,* and the Jury could look to all the matters before stated, such as amount of tolls received, damages to other interests, value to the company, &c. for the purpose of ascertaining them.

Young, assignee, &c. vs. Harrison and another, adm'rs, &c.

To which refusal to charge, and charge as given, Young excepted.

2d. To charge the Jury, that said damages cr value is to be estimated without taking into consideration the value of the bridge and the amount of tolls received thereon, which charge, as asked, the Court refused to give, and gave in lieu thereof—that the damages or value was to be estimated without taking into consideration the cost of bridge, but in order to arrive at them the Jury might take into consideration the amount of tolls received upon the bridge.

3d. To charge the Jury, that said damages or value is to be estimated without taking into consideration the franchise, or the right to build and have the bridge. That while the title to the land was in the Harrisons, the franchise or right to build the toll bridge was in the State, and there remained, until the Act of incorporation conferred it upon the Bridge Company, and that said grant to the company does not, in law, enhance the value of the location as a bridge site to the Harrisons.

Which charge, as asked, the Court refused to give, and gave in lieu thereof, that the value, as a bridge site, was to be estimated by its value to the Irwinton Bridge Company; and that for the purpose of arriving at it the Jury might take into consideration the franchise to the company.

4th. To charge the Jury, that the Harrisons were entitled to recover the damages or value as a bridge site, and for all other purposes to which they could appropriate it, except and irrespective of the franchise or right to build the bridge.

Which charge, as asked, the Court refused to give, and gave in lieu thereof, that its value to the company was to be estimated, and that the Harrisons were entitled to recover as much therefor, as though they had the franchise.

5th. To charge the Jury that the Harrisons had neither the right to establish toll bridges or toll ferries, and therefore the building of the one or destruction of the other, does not enter

as an element of damages or value under the Act of incorporation.

Which charge, as asked, the Court refused to give ; and gave in lieu thereof, that if the building of the bridge has in any way affected the private interests of the Harrisons, they are entitled to compensation therefor, though they did not have the right to build or establish toll bridges or toll ferries, and have no right to compensation if destroyed.

6th. To charge the Jury, that the increased or decreased value of the other parts of Harrisons' land, because of the building of the bridge, for ware-house, wharf or other purposes ; and the increased or decreased value of the property in Eufaula, is not to be taken into consideration to increase or decrease the damages or value of the land on which the bridge is built.

Which charge, as asked, the Court refused to give, and gave in lieu thereof, that the decreased value of any property, no matter what, owned by the Harrisons, was to be taken into the account, as well as the increased value of any property to the company.

7th. To charge the Jury, that the Harrisons are entitled to recover, in this case, the damages or value of the land as a bridge site, and for all other purposes not connected with the franchise, to be estimated upon the condition of the land when the Bridge Company took possession thereof, and *mesne* profits for its use in their action of ejectment now pending, as decided by the Supreme Court, in the case reported in 3 *Kelly*.

Which charge, as asked, the Court simply refused to give, charging nothing in lieu thereof.

8th. To charge the Jury, that they should only give such damages to the Harrisons as they shall think, from the evidence, they would have given, had they been selected to appraise the land as a bridge site, giving just compensation without extortion, knowing that the Harrisons had no right to build a toll bridge at the place.

Which charge was given.

9th. To charge the Jury, that they must leave entirely out

of their computation the value of the franchise which was granted to the company.

Which charge, as asked, the Court refused to give, and gave in lieu thereof, that the Jury could take into consideration the franchise, in estimating the value of the bridge site to the company.

10th. To charge the Jury, that under the Act of incorporation, the damages or value of the site to the Harrisons must be estimated, and not the value of the site to the company. Which charge the Court simply refused to give.

11th. To charge the Jury that the Harrisons had no right to establish toll ferries or build toll bridges, without a grant from the State; that the State not having granted such right, the Court and Jury cannot confer it, either in the shape of tolls or in any other mode; that they (the Harrisons) are entitled to just compensation only for the land actually appropriated to the use of the bridge, and that in estimating such compensation, all the uses or purposes to which that land, and that only, could be appropriated, are to be taken into the account.

Which charge, as asked, the Court refused to give, and Young, assignee, then and there excepted to each and every of said specific charges, as refused to be given, and to each and every charge as given in lieu thereof.

The Jury returned a verdict for $13,007 00.

A new trial was moved on all the exceptions taken, and also because the damages assessed were excessive. The refusal to grant a new trial is also excepted to.

On all the exceptions error has been assigned.

Judge BENNING having been of Counsel in this case, did not preside.

H. HOLT, for plaintiff in error.

S. JONES; L. WARREN, for defendant in error.

*By the Court*—STARNES, J. delivering the opinion.

[1.] The main question, in this case, arises on the point made as to the proper measure of recovery for the land which has been taken from the intestate, whom these defendants in error represent, by the Irwinton Bridge Company, as a site for one of the abutments of their bridge.

The Act incorporating the Company, provides that the "damages or value of the land required by the corporation," shall be ascertained by appraisers, or by a Jury, upon appeal to the Superior Court; and shall constitute the compensation of the landholder. This provision is not very explicit, but we think that it was not intended to conflict with the principles of the Common Law of force in our State, or with that feature of the Federal Constitution, if it have any thing to do with the case, requiring that private property shall not be taken for public purposes without "just compensation." We think that this provision of the charter was simply intended to declare the method by which such just compensation should be awarded; and that the only true measure of recovery in this case is that which secures that compensation. The simple inquiry should be then, how shall such compensation be ascertained.

Let us look at the question from this point of view, and we will readily see that the land owner in this case cannot get compensation for the deprivation of this particular piece of ground, unless he receives, in the first place, what it was worth, to him, as a bridge site, or its equivalent, at the time of such deprivation. But to determine what it was worth to him, we must look to the circumstances of the case. If he owned the land for half a mile on one side of the bridge and for a greater distance on the other, and if, consequently, there was no eligible site upon the land of any other person opposite to the town of Eufaula, (and these facts are stated in the testimony) then, upon the simple principle that supply and demand regulate the price of any given article, a bridge site upon his land was worth more than if the supply had been greater, and there had been

other localities upon the lands of other persons which might have been procured for this purpose. The land on which this bridge rests, in such a case, would be worth more, of course, than its value for agricultural purposes. It would have a particular value in the market, as a site for one of the abutments of a toll-bridge—a value to be regulated according to the extent of the demand.

It is then necessary to ascertain the extent of this demand. If the proposed bridge was to be constructed upon a highway over an inconsiderable stream, one not navigable, or upon a navigable stream, at a place where there were no improvements or prospect of improvements, in the shape of a town or village, or place of trade and of shipping produce, the site of the bridge would be worth much less to a company proposing to construct it and procuring a charter for this purpose, than if the bridge was to be constructed over a navigable stream, one on whose banks there was the prospect of a thriving place of business springing into existence by the aid of such a crossing place; and thus attracting much trade and travel across the bridge; and it is plain that the site of the bridge, in the latter case, would be increased in value, solely because the bridge would be more valuable.

We perceive at once, therefore, how important, nay, how necessary it is, where private property is thus taken from a citizen (who holds it in the market as a bridge site) by a chartered company, who take it from him avowedly for public purposes, but also by erecting a toll-bridge to enhance their own gains and profits, that in order to ascertain the value of that piece of ground to the owner, and thus give him "just compensation" therefor, the value of the bridge as a toll-bridge to the company should be ascertained, if possible, or approximated, by ascertaining the character of the stream and of the place of crossing, the amount of travel and transportation which would probably pass over it, and the consequent amount of toll which would be received yearly. And if the effect of constructing such a bridge would be to build a large town, warehouses, &c. at or near the place, and thus attract much transportation and

travel across the bridge, this of course would make it more valuable to its proposed owners—would make it more to their interest to pay a higher price for the site—that is to say, would be to *increase the extent of the demand for the bridge site.* In such case, it would certainly be a great hardship, not to be tolerated, in a free country, if a citizen, owning a piece of land of this description, whose prospective value, derived from its situation as affording facilities for a bridge site, was as *much his property* as was its soil for planting purposes, (it may, indeed, have been purchased with reference to such value) could be compelled to part with the same, and forced to give up his property in the prospective value of the ground, and receive only its value for agricultural purposes, or its value as a bridge site on the day when it is taken, estimated by the trade and travel which would that day have passed over it if the bridge had been built. Such could not be a case of "just compensation."

It is not difficult to see that such prospective value of a piece of ground might be its chief element of value to its owner. An owner of land, peculiarly situated by reason of its proximity to some great city or great work of internal improvement, may look into the future and see that it will, at some distant day, become extremely valuable by reason of its situation, and that none other can be procured for the purpose for which he anticipates that it will be needed. He desires, accordingly, to keep it, knowing that it will be a fine property for his children, if not for himself. If deprived of that property for public purposes, and especially for the benefit, at the same time, of a private company, can he have "just compensation" unless reference is had to the prospective value of the land, and unless that is, to some extent at least, taken into the account?

Let us present an illustration: we will suppose that soon after the depot of the Central Rail Road & Banking Company was established in Savannah, the company anticipating the enlargement of their business and the extension of their road, became desirous of purchasing a lot of land which lay near thereto, over which to construct a turn-out, or erect some im-

provement, which the interests of the road required.    They proposed to purchase this ground from the owner, and offered to him what such lots were worth in that part of the town, without reference to the road.    He declined, saying, "if there be other lots which can be had for the same purpose, then I grant that I may be compensated when I get for my lot that for which you might purchase such lots.    But if there be no other lot but mine which will serve the important purpose for which it is desired, and if in process of time the enhanced value of my lot, by reason of your road, will be a fortune to my children, it is my interest and that of my heirs, to retain possession of my lot until its value is thus enhanced.    And you cannot have it unless you give me "just compensation" by taking into view its prospective value, and paying me what it is reasonably worth to you as part of your investment."    Would not this answer have been founded in correct principles, and if the Rail Road Company had taken possession of said parcel of ground, by virtue of their charter, would not any Court have required them to give "just compensation" therefor, by taking into consideration the value of said property, according as it might be estimated with reference to the improvements going on in its vicinity?

In this point of view, it was proper for the Court below to charge the Jury, that in order to ascertain the value of the land in question as a bridge site, they would have to inquire the probable extent of the town or village, the amount of travel, tolls, commerce, and the probable value of ware-houses, wharves, &c. to grow up on the other side of the river.    And for this purpose, the testimony to this effect of the witnesses, was properly admitted.    The value estimated, should have been the value at the time the property was taken, what it should then sell for as a bridge site, taking into consideration the number of other lots in the vicinity belonging to other persons, which might be used for such purpose, and the probable value of the bridge to its owners when it should be erected.    And such should have been the method of ascertaining it, if it had been assessed at the time the land was taken.    Interest upon the

value, at that time, should be added, if the assessment be made at a date long subsequent. (*Parks vs. Boston,* 15 *Pick.* 206.) And when, at a subsequent date, especially if many years had elapsed, it became necessary for a Court and Jury to ascertain what was the value of the land at the time it was taken, with reference to its prospective advantages, surely no more accurate criterion could be found than proof of the amount of tolls which had been received, the value of the structure, &c. as it then stood.

[2.] But there is another element in the calculation of what would be just compensation to the land owner in such a case. If, by depriving him of this piece of ground, the value of his contiguous property was seriously impaired, that also should be taken into the account, in order to insure him just compensation. If, by taking this piece of ground from the intestate of the defendants in error, and the erection thereon of a bridge, his land contiguous to it was depreciated in value for warehouses or other purposes, it would seem that he or his representatives could not be compensated for that which had resulted from the deprivation of this property, unless this injury were taken into the account. There can be no doubt that this principle is correct, so far as immediate damage is concerned. Some persons have hesitated in applying it to prospective or consequential damage. But we apprehend that when the effort is made, not a little difficulty will be found in discriminating between the two, in distinguishing them or telling where one begins and the other ends. We incline to think that the simple rule is the best rule, and that is tested by the inquiry— can it be clearly and plainly ascertained that a pecuniary loss has resulted to the land holder in the value of his contiguous real estate, by the deprivation of the land in question? And especially is this the better rule, if consequential benefit to the land owner is carried to the other side of the account in estimating compensation. We will presently show that this should be done.

It will be remembered that the question, is not whether or not an action will lie at Common Law for such consequential

or prospective damages.   Such an action, we know, would not be maintainable, because that could not be held to be a *tort* which was done by authority of law.   And it is to this point that the *dicta* read from *Sedgwick on Dam.* 110, 111, were applicable.   But the question is, whether or not commissioners or appraisers, or a Jury acting as such (under a statutory regulation) appointed for the purpose of ascertaining such *just compensation,* and thus empowered to look into the natural equity of the case, should take such consequential damage into consideration, where it is plain, definite and appreciable.

In a learned treatise on this subject, to which we have been referred by the Counsel for the plaintiff in error, we find this rule supported as follows :  " If damages are the necessary result of a franchise, they are always provided for, and may be ascertained by commissioners, whose duty it is to take into consideration prospective as well as immediate injuries, but no compensation is due for damages resulting from extraordinary causes.".  (*Am. Law Mag. Apl.* 1843, *p.* 70.)   This rule is laid down, too, in one of the cases read by the Counsel for the plaintiff in error.   In the case of *Callender vs. Marsh,* 1 *Pick.* 432, the Supreme Court of Massachusetts say:  when highways or public streets are "rightfully laid out, they are to be considered as purchased by the public of him who owned the soil, and by the purchase the right is acquired of doing every thing with the soil over which the passage goes, which may render it safe and convenient ; and he who sells, may claim damages not only on account of the value of the land taken, but for the diminution of the value of the adjoining lots, calculating upon the future probable reduction or elevation of a street or road ; and all this is a proper subject for the inquiry of those who are authorized to lay out, or of a Jury, if the parties should demand one."

Several decisions, to this effect, by other distinguished Judges in the United States, may be found ; and their roots are inserted deeply into the principles of natural equity, of the Common and Civil Law, and of the Constitution.   In England, too, sim-

ilar decisions have been made—some of them quite recently. To a few I will call attention.  By the 7 and 8 *Vict. c.* 53, the Hull Dock Company were empowered to take certain lands, and in default of agreement with the owners, the Act provided that "the purchase money and compensation for dam-- ages sustained, before the time of inquiry, or future damage, were to be assessed by a Jury:" *Held,* " that these words were large enough to include compensation to a land owner for loss which he would have to sustain by giving up his business as a brewer, until he could obtain other suitable premises for carrying it on." (*Jubb vs. Hull D. Co.* 9 *Q. B.*)

See also *Lawrence vs. Great N. R. Co.* 15 *Jur.* 652.  *E. & W. Ind. D. Co. & B. J. R. Co. vs. Gattke,* 15 *Jur.* 261. *L. & N. W. R. Co. vs. Bradley,* 15 *Jur.* 639.)

[3.] But, upon similar principles of justice, if the damages in such case resulting should be considered, so should the bene-- fit to the land holder.   As we have suggested, the proceeding by appraisers or commissioners, or a Jury in their stead, upon ap- peal, to ascertain the just compensation due a land holder, is not the action of a tribunal organized and proceeding according. to strict Common Law forms, and Common Law rights. Such a tribunal may, therefore, even if no  special provision be made by Statute, to this effect, consider the equities of the case, and render justice accordingly.

No one can dispute the strong natural equity which dictates the propriety of considering the advantages, which the land holder has gained by reason of his land having been taken for some public work, as an offset to the injuries.   And if this be natu- rally just, and the forms of law do not obstruct, why should not the award or verdict be rendered accordingly ?

The terms employed, and the character of the proceeding, support the idea, that this is what is intended.  *Compensation* is the thing provided for—*just compensation*—not *payment in money.*   And the term *compensation* seems to have been ad- visedly adopted.   It is borrowed from the Civil Law, where its use and signification strikingly favor the view we are submit- ting.   We know, too, that damages for a civil injury might be

compensated, or pleaded as an offset in some cases at the Civil Law. (*Inst. L.* 10, §2 *D. de Compens.*) When, then, we find the word employed in the Common Law and the Constitution, to the case in question, the presumption is that it was done advisedly; that the word was used in its most familiar legal sense; that it was thereby intended that "recompense" —not alone payment in money, should be made to the land holder; that as *just* compensation was required, it should be made upon principles of equity; and that accordingly, all such advantages or benefits derived by the land holder, by reason of the public work, or the exercise of the franchise, upon his land, as made it just and equitable that he should not be paid in money for his land, should be carried to the account of such compensation.

This branch of the subject is very ably discussed in the same excellent treatise to which we have already referred, and in which the learning on this subject is thoroughly considered and exhausted. Adverting to this proceeding by a board of commissioners or appraisers, for the purpose of assessing damages, the author says: " a board of commissioners does not proceed upon the principles of Law. They do not simply determine the amount or degree of damage. They take into consideration the advantage derived, as well as the damages sustained, and ascertain the measure of indemnity by other rules than those which govern Courts of Law. Even if the question of compensation be submitted to a Jury, they act in the character of commissioners. Whether claims for damages are acted upon by a Jury or commissioners, they may be regarded as administering a delegated authority—as exercising a legislative function; and thus, dispensing the discretion of the sovereign or the Legislature." (*Amer. Law Mag. Apl.* 1843, *p.* 55.)

We apprehend that this is entirely correct, and that the Courts who have held that the land holder, under the requirement of the Constitution, should be paid for his land *in money,* (especially the Supreme Courts of Kentucky and Tennessee,) have lost sight of the above considerations.

It is sometimes said that the benefits derived by a land hold-

der from a public work, for the benefit of which his land has been taken, should not be considered except so far as they are advantages peculiar to himself (as the erection of a station for example, which enhances the value of his land) and not enjoyed by other land owners contiguous to the improvement. But this is not logical. What matters it, if others have been benefitted? They are taking no issue with those who construct the public work. But he whose land has been taken is making such issue, and the duty has been devolved on his fellow citizens of ascertaining whether or not he has been injured, and if so, how much. And can they say he has been injured and is *justly* entitled to compensation, if they find he has been benefitted?

It is very true that the method of arriving at such compensation is, in its nature, not very precise, and more or less dependent upon the speculative opinions of witnesses. But this is no good objection, or a very large portion of that testimony which is constantly and necessarily received in Courts of Justice, for the purpose of ascertaining the value of property and the damage done to it would be excluded.

We add that this just method of settling the interests of such parties, has received the repeated sanction of our Legislature. For this provision that the damage to the land holder shall be estimated on one side, and the benefits on the other, and the balance in his favor, if any, shall constitute his compensation, has its place in the charter of almost, if not quite every Rail Road or Plank Road, which has been incorporated in our State.

In accordance with such views as we have just presented, the testimony which was admitted by the Court for the purpose of proving the value of property in the town of Eufaula, and of the value of the bridge, viz: of Seaborn A. Smith, except so much of it as related to the value of Seth Lore's property, (and that was proper as serving to show why he may have been willing to take less than its real value for the site on which the abutment of the bridge rested in Alabama), the evidence of George W. Pournell, the evidence of George L. Barry of Henry L. Taylor, of John R. M. Neel, and the records of the Inferior Court establishing roads, were properly admitted.

· [4.] To the withdrawal of the deed of Seth Lore, the record shows objection was made by the plaintiff in error, the defendants offering to withdraw the same from the Jury as evidence. It would be very strange, indeed, if, after an objection of this kind from the plaintiff in error, he could be allowed to take advantage of any error in its admission.   If the deed had been improperly admitted, and the plaintiff in error, apprehensive that the minds of the Jury had been prejudiced by having seen the deed, desired to take advantage of this, by way of exception, he should have permitted the deed to have been withdrawn, thereby sanctioned the position that it was improper, and have availed himself of his right to except to its admission at all.   But as the point is presented, the record exhibits the plaintiff in error in the attitude of objecting to the withdrawal of a piece of testimony, insisting that it should remain with the . Jury as evidence, thereby sanctioning the idea, for the purposes of that investigation by the Jury, that it was evidence; and afterwards, objecting that the Court erred in permitting it to go to the Jury as such.

In accordance with the principles just laid down, too, the charge of the Court, as we understand it, when construed with reference to the case made by the evidence, was for the most part substantially correct.   His Honor was not exactly accurate, however, in saying that " the estimate of value or damages was to be made, now, as of the present time, when the title is to be divested," without sufficiently qualifying this, and showing that the circumstances of present value, &c., might be considered, but as a criterion of what was the prospective value of the land, and extent of damage, &c., at the time when the land was taken by the company.

[5.] But in our opinion, the Court erred in ruling out the plat of said ground as evidence in the case.   The same being made proper evidence by the Act incorporating said company, and required to be filed as such with the verdict of the Jury. ··And without which, there was no specific evidence of the land taken, before the Jury.

·. This appears to be strictly a technical error.   But granting

that it is so, it is a material error. And for reasons which perhaps it is unnecessary to particularize, we are not altogether dissatisfied, that it gives us the opportunity to send the case back for a re-hearing.