GATE CITY TERMINAL COMPANY *v.* THROWER.

1. The motion to dismiss the writ of error is denied,. for the reasons set forth in the opinion.
2. Where, on the day the award of assessors selected in condemnation proceedings is made, the condemning party pays or tenders the amount of the award to the owner of the property sought to be condemned, and takes possession of the property, on the trial of the case before a jury in the superior court, on appeal from the award, the compensation the jury should find for the owner is the value of the property on the day of the award and interest thereon from that date.
3. If, at the time the market value of the property sought to be condemned was to be estimated, it was known or anticipated that certain improvements would be made in the locality where the property was situated, and this fact served to enhance the market value of the property, the owner would be entitled to the actual market value as affected by reason of the fact that it was known or anticipated that such improvements would thus be made. This is true though the projected improvements were to be made by the condemning party.
4. There was no error requiring a new trial, and the evidence was sufficient to support the verdict.

JUNE 20, 1911.

Appeal from condemnation. Before Judge Pendleton. Fulton superior court. July 20, 1910.

On August 14, 1906, the Gate City Terminal Company gave proper notice and began proceedings to condemn certain property. On September 1, 1906, the defendant in error, M. L. Thrower, obtained a temporary restraining order enjoining these proceedings. One Bridwell also sought to enjoin proceedings by the same company to condemn his property. Both injunction proceedings involved the question as to whether the company had the right of eminent domain, and it was agreed that the injunction case begun by Thrower should abide the final judgment rendered in the case begun by Bridwell. It being finally decided by this court, on March 14, 1907, that the company had the right of condemnation, the restraining order obtained by Thrower was dissolved, after which the condemnation proceedings were carried on; and on April 20, 1907, an award was made by the assessors, valuing the property at $6,000, which the company tendered or paid on April 20, 1907, and on that day took possession of the property. Thrower entered an appeal from the award, and on the trial in the superior court the jury rendered a verdict valuing the property at $8,500. To the order of the court refusing a new trial, the company excepted. The plaintiff in error (hereinafter called the plaintiff) introduced, upon the trial of the case before the jury, testimony in part substantially as follows: Miss Flynn sold the property to Mr. Crockett for $1,800. The deed from the former to the latter, dated April 15, 1905, reciting a consideration of $1,800, was introduced in evidence. Several witnesses testified that they examined the property after the condemnation proceedings were begun. One of them testified that he estimated its market value to be $3,645, and in making the estimate he "made an allowance of 100 per cent. on account of the prospect of the railroad terminals being located in that locality." Another witness testified that the market value of the property was $3,750. Another witness testified that its market value was between $3,500 and $5,000. Thrower testified, in part, as follows: He bought the property in 1906 from Mr. Crockett. "At the time I bought the property, the railroad had graded out along side of the property, and they had practically bought everything in the block, with the exception of this and the Volberg property, and I agreed to pay Mr. Crockett $14,000 for the property. It was my estimate it was railroad property when I bought it. I bought it as such. . . I agreed with

Mr. Crockett, along the first of August or the latter part of July, to give him $14,000 for it. I had the titles examined, and it was closed up some time the latter part of August, 1906. I bought the property before I knew of the condemnation proceedings. The agreement was made in July. . . When I bought the property from Mr. Crockett it was graded along the side, the 200-foot side, down to a depth of some 20 feet, up to the line of this property. After I bought the property I tried to sell it. In April, 1907, the market value of this property was $16,000 or $17,000, considering the railroad there. Excluding the railroad purposes makes a difference in the value of that property of about one half; possibly a little more. The house rented for $25 a month. Putting it on a 4 per cent. basis, it would be worth about $7,500; you have got to pay taxes out of that. . . He deeded me the property that is sought to be condemned, after the condemnation proceedings, about the latter part of August, the 27th I believe, 13 days after the condemnation proceedings started. . . At the time I bought the property I didn't think the Gate City Terminal Company could condemn it. I thought I could get a little profit from it, like I would on any other piece of property I bought. I had a notion that I could get a little more for it than I gave for it. I didn't have a notion that I could get my own price for it. . . When I bought I didn't know what they were going to do there. I know property went mighty high around the terminal station. . . If the railroad had not taken the property—if they had not built freight or passenger terminals in there, you could have used it for manufacturing sites close to it, or for warehouse or hotel property; it is closer to the center of the city than the Aragon Hotel. If the railroad had come up to my property, but had not taken it, it would have been worth about $10,000." E. Y. Crockett testified: "I bought the property from Miss Flynn something like three years before, April 15, 1905. I got my deed July or August of that year. I spent about $1,400 in improvements. . . I considered the market price was what I got for it—$14,000. . . I told Thrower that Adair was trying to buy this for the railroad." Geo. B. Sanders testified: In March, 1907, he thought the market value of the property was $15,000 or $16,000. It was worth $3,000 or $4,000 "before the contemplation of the railroad." John W. Alexander testified: "The

depot is, I think, on a part of that lot now. . . Before the ex-
citement about the railroad I don't think this lot would have been
worth over four or five thousand dollars. About the middle of
August, 1906, I considered the lot worth twenty or twenty-five
thousand dollars. I considered the lot worth twenty or twenty-
five thousand dollars, because it was there on the railroad, that
near in town; it was expected to have a railroad front at that
time; we knew pretty well where they were going to locate the
railroad; the whole of my valuation is if it had a railroad front.
If it didn't have a railroad front, it would not be that valuable;
if the road was right near it, it would be worth $10,000." Fred
J. Cooledge testified: "I think I knew what the property was
worth about August, 1906, that was after the railroad had bought
nearly all of that property. The market value of the Thrower
lot in August, 1906, was something like sixteen to eighteen thou-
sand dollars. I got at that valuation by reason of the fact that the
railroad owned right up to it; it had an alley coming up to the
rear, and that was the key to the situation. I mean that the
railroad had to have the alley to get into the property from back
behind it. If the railroad didn't want that alley, they wouldn't
have to take it. I should think that that property, before any rail-
road was contemplated there, would have brought in the neighbor-
hood of $5,000." J. A. Bondurant testified: "In April, 1907,
that property was worth sixteen or eighteen thousand dollars.
Before the railroad entered, that property was worth about $4,500
I think. Property went up as soon as they commenced building
a terminal station around there; but it didn't go up like the prop-
erty the railroad didn't take; it all went up pretty high. If the
railroad had not built there, although the terminal station was
built there, it would be worth $16,000. The terminal station
has been built about five years; property commenced going up
from the time it was built. That piece of property was worth
eight or ten thousand dollars after the terminal station went up.
It was worth $4,500 before 1906." R. Blair Armstrong testified:
"I was familiar with this piece of property owned by Mr. Thrower,
formerly by Mr. Crockett, and with its market value in August,
1906. I think that piece was worth eight or nine thousand dollars.
In the next twelve months the railroad had done a lot of grading,
and I think they owned all but one piece of property around there,

and that piece, and by that time I would say that piece was worth about $15,000, for Mr. Thrower held the key to the situation. That the railroad had to have that piece of property is one reason why it was the key to the situation; but it could have been used for a warehouse." Dr. De Los Hill testified: "I was familiar with my estimate of its market value in 1906, which is from $15,000 to $20,000. . . There was an excavation going on in the same block, I can't say just how close to that lot, but all around the lot on one side at least there was a hole in the ground; on one side of the lot, some feet away, leaving room to hold up the bank, and some feet between that bank and that lot. I thought it possible that the railroad might have to have the property; that entered into the valuation of it; that was one of the points putting a valuation on it. The market value of the property in case the railroad did not take it, but made it a railroad front, was $15,000 to $20,000."

*Rosser & Brandon* and *Colquitt & Conyers*, for plaintiffs in error. *Westmoreland Brothers*, contra.

HOLDEN, J. (After stating the foregoing facts.)

1. The Gate City Terminal Company instituted condemnation proceedings to condemn certain property in the City of Atlanta belonging to M. L. Thrower. Written notice by the former was given to the latter, on August 14, 1906, of its intention to condemn the property, and therein a request was made that Thrower appoint an assessor to meet the named assessor selected by the company on the premises on September 3, 1906. On April 16, 1907, the two assessors selected appointed the third assessor, and on April 20, 1907, an award was made that the company pay Thrower $6,000 for the property. On April 25, 1907, Thrower entered an appeal from this award to the superior court, and on April 3, 1909, the jury upon the trial of the case rendered a verdict as follows: "We the jury assess the value of the defendant's property taken at the sum of eighty-five hundred dollars ($8,500)." A motion for a new trial was made and overruled, and to the refusal of a new trial a bill of exceptions was filed by the Gate City Terminal Company. Thrower made a motion to dismiss the writ of error, upon the following grounds, to wit: "First, because there was no such case tried in the court below as is brought up in the bill of exceptions in this case. Second, because the case tried in

the court below was in the name of Henry M. Atkinson and Samuel F. Parrott, receivers of the Georgia Terminal Company, and the Georgia Terminal Company as the legal successors of the Gate City Terminal Company, and the motion for new trial filed in this case so states. As proof of this, an appeal is made to the record." Whereupon the following motion was filed by counsel for the "Georgia Terminal Company and Henry M. Atkinson, receiver of Georgia Terminal Company": "1. That the Georgia Terminal Company is the same as the Gate City Terminal Company, the name simply having been changed. 2. Henry M. Atkinson is now the sole receiver of the Georgia Terminal Company. 3. Samuel F. Parrott, formerly one of the receivers of the Georgia Terminal Company, is now dead, and said Henry M. Atkinson has been appointed and is now the sole receiver of said company. Now, therefore, the said Georgia Terminal Company and the said Henry M. Atkinson, as receiver of the Georgia Terminal Company, pray this court to be made parties plaintiff in error in the above-stated case." On April 2, 1909, the following order was passed by the court in the case: "It being made to appear to the court that the property of the plaintiff corporation is in the hands of Henry M. Atkinson and Samuel F. Parrott as receivers of the United States Circuit Court for the Northern District of Georgia, it is therefore ordered that the said Henry M. Atkinson and Samuel F. Parrott as such receivers be and they are hereby made parties plaintiff in the above-stated cause, in lieu of the Gate City Terminal Company, and that the case proceed in the name of said receivers." Upon the verdict rendered on April 3, 1909, a judgment signed by the court and counsel for Thrower was entered as follows: "Whereupon it is ordered by the court that M. L. Thrower recover of H. M. Atkinson and Samuel F. Parrott, receivers of the Gate City Terminal Company, the sum of eight thousand five hundred dollars, to be credited with six thousand dollars paid to M. L. Thrower on April 20, 1907, the date of the award of the assessors in said matter, and execution will issue in favor of M. L. Thrower against Gate City Terminal Company for the sum of twenty-five hundred dollars and the sum of three-hundred and fifty-six dollars as interest on twenty-five hundred dollars at 7 per cent. per annum from April 20, 1907, to date; and when said sums are paid, the Gate City Terminal Company

will be entitled to the possession and use of the property described in this proceeding." The original motion for new trial recites: "Now come Henry. M. Atkinson and Samuel F. Parrott, receivers of the Georgia Terminal Company, and the Georgia Terminal Company, and, first showing that they were by order of the Honorable Don A. Pardee, Judge of the Circuit Court of the United States for the Northern District of Georgia, on the 19th day of March, 1909, appointed receivers of the Georgia Terminal Company, and that the said Georgia Terminal Company is the legal successor of the Gate City Terminal Company, the plaintiff in the above-stated case, say: Plaintiff, being dissatisfied with the verdict and judgment in the above-stated case," etc. The amendment to this motion begins as follows: "Now comes the movant, the Gate City Terminal Company, and before the hearing of its motion for new trial heretofore filed in the above-stated case," and in the concluding sentence of the amendment it is recited, "Wherefore movant prays that the foregoing grounds be added to its motion for new trial by amendment." The original motion and the amendment thereto were both signed by attorneys as "Attys. for movant."

We think the motion to allow the receivers of the Georgia Terminal Company and the Georgia Terminal Company to be made parties plaintiff in error in the bill of exceptions should be allowed, and the motion to dismiss the writ of error denied; and it is so ordered. The record shows that an order was taken, before the trial of the case, making Atkinson and Parrott, receivers, parties plaintiff in the case. The original motion for a new trial was made by Atkinson and Parrott as receivers of the Georgia Terminal Company, and the Georgia Terminal Company, and recites that Atkinson and Parrott were appointed receivers of this company by the Federal court and that this company "is the legal successor of the Gate City Terminal Company, the plaintiff in the above-stated case." Counsel for Thrower acknowledged service of the motion, and the record does not show that they ever made any complaint that the recitals above referred to in the original motion were untrue; indeed, the ground of the written motion of Thrower to dismiss the writ of error is "because the case tried in the court below was in the name of Henry M. Atkinson and Samuel F. Parrott, Receivers of the Georgia Terminal Company,

and the Georgia Terminal Company as the legal successors of the Gate City Terminal Company." The amendment to the motion was in the name of the Gate City Terminal Company, and the judgment on the verdict, signed by counsel for Thrower, directs execution to issue against the Gate City Terminal Company for the amount of the judgment, and that upon the payment of that amount the Gate City Terminal Company "will be entitled to the use and possession of the property." It seems that the corporation organized as the Gate City Terminal Company still remains in existence, but under the name of the Georgia Terminal Company, for whom Atkinson and Parrott were appointed receivers. At the time of the trial these receivers were in possession of the property held by the corporation originally chartered in the name of the Gate City Terminal Company. The Gate City Terminal Company and the Georgia Terminal Company are not separate and distinct corporations. The corporation originally chartered as the Gate City Terminal Company has never gone out of existence, but its name has simply been changed to the Georgia Terminal Company. If a suit were instituted by an unmarried woman, and by amendment the suit proceeded in her name acquired by reason of her marriage pending the suit, and if a bill of exceptions was filed in which it was recited that the name of the plaintiff in error was the one she bore before her marriage, we think the mistake could be cured by amendment, if the record disclosed the facts hypothesized; as no new party would be substituted by such amendment, but the same person would be plaintiff in error under her proper name. We do not think the allowance of the motion that the name of the plaintiff in error be changed as therein prayed would be striking one party and adding another new and distinct party plaintiff in error, but we think the same corporation would be plaintiff in error under its proper name and the name of its receivers.

2. The proceedings to condemn certain property for public use, instituted by the Gate City Terminal Company, were begun on August 14, 1906; and on September 1st, 1906, Thrower, to whom the property then belonged, obtained a temporary restraining order enjoining the further prosecution of these proceedings. This restraining order was dissolved in March, 1907, and on April 20, 1907, an award was made by the assessors, valuing the property

at $6,000. Thrower entered an appeal, and the jury, in April, 1909, rendered a verdict fixing the value of the property at $8,500. A judgment on this verdict was rendered for the $8,500 "to be credited with six thousand dollars paid to M. L. Thrower on April 20, 1907, the date of the award of the assessors." In an agreed statement of facts, constituting a part of the evidence, it is said that after the dissolution of the injunction "condemnation proceedings were carried on, and the award made, and the money tendered, and the property taken possession of on April 20, 1907." Complaint is made that the court erred in charging the jury that "Just and adequate compensation means the market value of the property, the actual cash market value of the property on April 20, 1907;" and in refusing a timely written request of the plaintiff in error to charge: "Just and adequate compensation which the plaintiff must pay for the property sought to be condemned is the market value of the property at the time of the institution of the condemnation proceedings;" and also in refusing a written request to charge: "The just and adequate compensation which the plaintiff must pay for the property sought to be condemned is the market value at the time the defendant M. L. Thrower prevented the assessment of this property by enjoining the plaintiff from continuing with its condemnation proceedings." Complaint is also made that the court erred in admitting the testimony of Thrower that "The market value of the property in April, 1907, just before the appraisement in this case, considering the railroad there—the market value of that lot was $16,000 or $17,000," over objections of the plaintiff that the same was irrelevant. The constitution of this State (Civil Code (1910), § 6388), provides that "Private property shall not be taken, or damaged, for public purposes, without just and adequate compensation being first paid." The time at which the value of property taken for public purposes should be fixed is the time it is taken, or the right to take it is complete. It can not be taken until just and adequate compensation is "first paid." Tender is equivalent to payment, and the right to take private property for public purposes by one having the right of eminent domain never exists until compensation is either paid or tendered. On April 20, 1907, the day the award of the assessors for $6,000 was made, the company tendered or paid this amount and took possession of the property, and on the trial of the

case before the jury to whom an appeal was had from the award, the compensation the jury should have given Thrower was the value of the property on April 20, 1907, and interest thereon from that date. *Young* v. *Harrison*, 17 *Ga.* 30 (1), 39; *Young* v. *Harrison*, 21 *Ga.* 591; *Selma &c. Railroad Co.* v. *Keith*, 53 *Ga.* 178 (6); *Oliver* v. *Union Pt. &c. Railroad Co.*, 83 *Ga.* 257 (9 S. E. 1086); *Georgia Southern & Fla. Ry. Co.* v. *Small*, 87 *Ga.* 355 (13 S. E. 515); 2 Lewis on Eminent Domain, § 705, p. 1220, and authorities cited in note on pp. 1224, 1225. The decision we make is not in conflict with the ruling in the case of *Georgia So. & Fla. Ry. Co.* v. *Small*, supra, where it was held that the compensation to be paid the owner was the value of the property at the time of the trial before the jury to whom an appeal was had from the award of the assessors. In that case, prior to the time of the trial before the jury, there had been no payment or tender of the amount of the award of the assessors, and the property had not been taken and no right to take it existed. The fact that Thrower obtained a restraining order enjoining the company from prosecuting the proceedings to condemn would not give the company the right to have awarded, as the amount of compensation to be paid, the value of the property at the date of the restraining order.

3: Complaint is made that the court erred in admitting in evidence, over objection of the condemning party, the following testimony: "The definite talk about a railroad coming in there enhanced the value of the property considerably in some places; I can not say what per cent. it enhanced it; at least two hundred per cent.; probably more than that in some cases; I can't say exactly." And the testimony of another witness, that "When it was determined where the terminal facilities of the A., B. & A. Railroad were going to be located, the property that was in the line of the improvements bounced up in price and went up very high—went towards the sky. The property that was in the line of the improvements jumped up higher in price than any other property. It increased the price of property where they told us the railroad would be located, more than anything else." And the testimony of another witness that "By reason of the fact that this railroad was going to want that property in that neighborhood, and going to establish terminals there, this property appreciated very much in value after I had been there the first

part of 1906." And the testimony of another witness that "The prospect of railroad terminals being built there increased the value of this property one hundred per cent.; the prospect of the railroad enhanced this property." And the testimony of another witness that "The fact that a railroad would come in there and want that property had a splendid effect on that property as to price." The objection to the testimony of each of the witnesses was the same, and as follows: "(*a*) On the ground that it was irrelevant; (*b*) And on the further ground that the benefit which this property would derive on account of a railroad coming through there could not be considered as an element in enhancing the value of the property of which the landowner could take advantage against the condemning railroad company."

Complaint is made that the court erred in refusing a written request to charge the following: "The effect any improvement that may be put upon the property by the party condemning may have upon its value can not be considered by you in passing upon its market value." The language of the charge requested was such that, if it had been given, it would have been liable to impress the jury with the idea that they could not consider the effect of building the railroad station in the locality where the property was situate upon its market value, and was properly refused.

The testimony above quoted was admissible, and not subject to either of the objections made thereto. The market value of the property on April 20, 1907, was the measure of compensation to be awarded to Thrower. Prior to this time the railroad company "had graded out along side of the property" to be taken. One witness testified: "We knew pretty well where they were going to locate the railroad." Another witness testified: "There was an excavation going on in the same block, I can't say just how close to that lot, but all around the lot on one side at least there was a hole in the ground; on one side of the lot, some feet away, leaving room to hold up the bank, and some feet between that bank and that lot." If at the time the market value of the property was to be estimated it was known or anticipated that the railroad company would construct a railroad and build the terminal station in the locality where the property was situated, and this fact served to enhance the market value, the owner would be entitled to the actual market value, as affected by reason of its being known or anticipated

that a railroad station would be built in that locality. This is true though the projected improvement was to be made by the condemning party. At the time the market value of the property was to be estimated on April 20, 1907, it was known, or at least anticipated, that the railroad and terminal station would be constructed in the locality where this property was situated. Where improvements in any locality of a certain kind, if made, would enhance the value of property in that locality, and a party having the right of eminent domain begins such improvements, and because of its being known or expected that the improvements will be carried to completion the market value of property in that locality is enhanced, the party seeking to condemn such property can not object to being made to pay the actual market value of it, before taking it, because it has been enhanced by reason of the fact that the improvements which are known or expected to be made will be made by the condemning party. See *Harrison* v. *Young,* 9 *Ga.* 359; *Young* v. *Harrison,* 17 *Ga.* 30; s. c. 21 *Ga.* 584. In 2 Lewis on Eminent Domain, § 745, it is said: "Whatever the time fixed upon with reference to which the compensation shall be estimated, the owner is entitled to the actual value of the land at that time, even though it may have been enhanced by reason of the projected improvement for which it is taken. It is said that it is not really making the condemning party pay for an enhancement from the mere projection of the work, but from the existence of circumstances which create a demand for the work, and render it probable that such a work will sooner or later be built. In so far as the enhancement is due to such circumstances, no doubt it is properly considered and allowed." See cases cited in notes to above text. We have been requested to overrule the decision in the case of *Young* v. *Harrison,* 17 *Ga.* 30, but we think the ruling there made is correct and decline to overrule it. Complaint is made that when that portion of the testimony of one of the witnesses above quoted was admitted, the court stated, in the presence of the jury: "It doesn't make any difference what caused the market value, but what it would sell for in the market at that time; anything affecting its market value. If somebody had gone along and stated that there was a gold mine in there, and by reason of that idle rumor it would have brought a certain sum in the market, that was its market value. It doesn't make any

difference what enters into it; it is what it would have sold for in the market; that is its market value." While this statement may not have been entirely accurate, we do not think it affords ground for a new trial. Another ground of the motion for a new trial is as follows: "Because the court erred, when movant was cross-examining the witness M. L. Thrower, a witness for the defendant in said case, on the question that even after the railroad and terminals had been established there, improved property across the street would sell for less money than about $5,000 or $6,000, after stating in the presence of the jury, 'I think you have to prove that the other property is similarly situated,' in ruling and stating in the presence of the jury as follows: 'But I think if there is any evidence as to where a railroad was to go, and where it was going to stop, that affected this property different from other property, that the valuation of other property is not material.'" The statement of the court complained of was not error requiring a new trial. Nor was there any error requiring a new trial in the ruling and statement referred to in the following ground of the motion for a new trial: "When movant sought, on cross-examination, to question the witness M. L. Thrower, with reference to what would be the market value of the property if the railroad had stopped its work at the time he bought the property and left it in the situation that it was then in, the court erred in ruling and stating, in the presence of the jury: 'I don't think you can show that if you were going to abandon your proposition, or anything of that sort, it would not have been worth so much. "If" is always a very uncertain word. Anything that enters into its market value then. It may have been a mere rumor, or it may have been something that never was going to happen; people might change their minds about it. Property might be worth so much in the market to-day, and it might be worth half of that the day after to-morrow, but it is the thing that causes the market value at any particular time, but not what it would be worth if things changed, or you didn't do something. I don't think that is admissible.' "

4. Complaint is made that the court erred in refusing to permit the plaintiff to introduce testimony of a witness, "that the market value of this property in 1905 was between $2,500 and $3,000." In excluding this testimony, the court stated "that going back to the market value in 1905 was most too far back to

go into the market value of the property." While we do not think that proof of the market value in 1905 related to a time so remote from that at which the market value was to be estimated as to render the testimony inadmissible, as there was testimony showing beyond dispute that the market value of the property before it was known or expected that the railroad or terminal station would be built was much less than it was after this fact was known or expected, we do not think the exclusion of the testimony affords ground for a new trial.

Complaint is made that the court refused to permit the plaintiff to prove, that, in making trades regarding the purchase of other property, "in order to get them closed quickly we paid in some instances excessive prices for them." The exclusion of this testimony was proper.

One ground of the motion for a new trial is that the "court erred in stating in the presence of the jury that the defendant [M. L. Thrower] had a right to get more than he paid for said property." Complaint is made that this "was an expression of opinion by the court that the defendant was entitled to receive more money than he paid for said property." In this ground it is stated: "Movant sets out the following portion of the record as showing exactly what happened in reference to said statement; Q. Didn't you have the notion that they would have to pay you for that piece of property whatever you wanted to ask them for it? A. I had a notion that I could get a little more for it than I gave for it. Mr. Colquitt: I think the witness should answer my question, your honor. The court: I think he has answered it—he had a right to get more than he paid for it." In the use of the words "I think he has answered it—he had a right to get more than he paid for it," the court was evidently undertaking to say that Thrower had answered the question asked him by stating that "he had a right to get more than he paid for" the property, and the court did not intend to state it as a fact that Thrower was entitled at the hands of the jury to more than he paid for the property. We do not think the jury were liable to misunderstand the language used by the court. The jury valued the property at less than the amount paid by Thrower for it, and the court instructed them that the compensation he was entitled to was the value of the property on April 20, 1907.

The court committed no error in excluding testimony to the effect that the railroad "had to fill in all the way from Bellwood, in order to get into town." This testimony was irrelevant and illustrated no issue involved in the trial of the case.

Counsel for Thrower, in his argument to the jury, stated "that the assessors in said case had awarded Mr. Thrower $6,000, and that the jury should certainly give Mr. Thrower more than this amount." Counsel for the plaintiff in error moved for a mistrial because of this statement; whereupon the court stated, in the hearing of the jury, that "in some jurisdictions the amount of the award was held to be prima facie evidence of the value of the property, and that the burden was upon the condemning party to show that this was not true." Plaintiff complains that the court erred in not declaring a mistrial, and in making the above-quoted statement in the hearing of the jury. The court in his charge said: "A statement was made in your hearing as to the amount the appraisers awarded the defendant. That statement must not be considered by you in any way. Eradicate it from your minds, and determine this case from the evidence before you." If the jury had no right to consider the award of the appraisers as prima facie evidence of the value of the property and the amount to be awarded the defendant, we do not think the refusal to declare a mistrial and the statement by the court in the hearing of the jury constitute cause for a new trial, in view of the above-quoted charge given the jury by the court in his general charge.

There was no error in the charge: "The price that the defendant paid for the property is a circumstance to be considered, along with all the other evidence in the case, in determining the issue in the case." The testimony showed that Thrower orally bargained with the owner of the property to buy it just a few days before the condemnation proceedings were instituted, and consummated the trade after such proceedings were begun, which was about seven or eight months before the award of the appraisers—the time when the value of the property was to be estimated. There was no error in the charge above quoted.

Complaint is made that the court refused to give the following charge requested by the plaintiff: "You have nothing to do with the question of whether or not Mr. Thrower makes or loses anything by his trade on this property; your only consideration is the market

value of the lot taken," and also in refusing a written request to give the following in charge: "The mere value of the lot sought to be condemned—to the condemning party—is not the market value." While these charges might very well have been given, we do not think their refusal error requiring a new trial. The court charged the jury that the compensàtion to be awarded Thrower was the market value of the property, and this charge necessarily meant that they were to find its market value regardless of what Thrower paid-for it, or its value to the plaintiff.

Complaint is made that the court refused a written request of the plaintiff to charge: "In finding the market value of this property you are not bound by the oral opinion of the witnesses as to its market value." The court charged the jury as follows: "The opinions of witnesses as to the value of property are not binding upon the jury in the sense that you must accept those opinions. You must give them such weight as you think they are entitled to, under the instructions given you and which will be given you." We think the charge given substantially covered the charge requested, and there was no error in refusing the request.

Complaint is made that the court erred in admitting, over the plaintiff's objections, the testimony of Thrower, "that when he bought the piece of property sought to be condemned the railroad owned every other piece of property on a particular 20-ft. alley that ran up to his property." Even if the testimony admitted was subject to the objection made thereto, "that there was better evidence to show what it [the movant] owned there," we do not think its admission error requiring a new trial, in view of the fact that it related to.a collateral matter and there was other evidence, admitted without objection, substantially to the same effect as the evidence to which objection was made.

One ground of the motion for a new trial is that the court erred in admitting, over plaintiff's objection, the following testimony of a witness for the defendant: "The market value of this property, in case the railroad did not take it, but made it a railroad front, was $15,000 to $20,000." We think this testimony was subject to the objection thereto, that it was "irrelevant and speculative," but we do not think its admission error requiring a new trial. There was testimony of other witnesses of the same nature .as that objected to, which was admitted without objection. One

of these other witnesses testified that with a railroad front the property would be worth from twenty to twenty-five thousand dollars. We do not think that a new trial should be granted because of the erroneous admission of this testimony, when the jury had before it, without objection, the testimony of several other witnesses regarding the value of the property, based on the idea that the railroad company did not take it, but that it would front on the railroad to be constructed by the company; especially in view of the fact that the witness delivering the testimony objected to did not make any difference in his estimate of the value of the property with a railroad front and of its value without such front.

Complaint is made that the court refused two written requests of the plaintiff to instruct the jury regarding the market value of the property. In one of these requests the following language appears: "Market value means the fair value of property as between one who wants to purchase and one who wants to sell, not what could be obtained for it under peculiar circumstances, when a greater [amount] than its fair market price could be obtained, nor its speculative value." In the other request the following language appears: "They [the jury] are not to consider the price at which the property would sell for under special or extraordinary circumstances." The language above quoted from the charges requested was liable to lead the jury to believe, under the special facts of this case, that they could not consider the market value as affected by the fact that it was known, or expected, that the plaintiff would construct a railroad or a terminal station in the locality where the property was situated, and the court properly refused to give the charges requested. A trial of the length and character of the one involved in the record before us is rarely kept entirely free from error. While some errors were committed, as hereinbefore pointed out, no error requiring a new trial appears, and the evidence was sufficient to support the verdict.

*Judgment affirmed. All the Justices concur.*